

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed August 12, 2013

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 11 |
| SMIC, LTD., *ET AL.*, | § | |
| DEBTORS. | § | CASE NO. 10-40120-DML-11 |
| | § | JOINTLY ADMINISTERED |
| _____ | § | _____ |
| | § | |
| CORRAL GROUP, LP, | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | ADVERSARY NO. 10-04054-DML |
| | § | |
| SMIC, LTD., *ET AL.*, | § | |
| DEFENDANTS. | § | |
| | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the court is the above-captioned adversary proceeding (the "Adversary"), which

was removed to this court from Tarrant County District Court on April 2, 2010.  *See* docket no.

1

1.[1]  By the Adversary, Corral Group L.P. ("Plaintiff") brings claims against SMIC, Ltd.

("SMIC"),[2] Winterstone Management, Inc. ("Winterstone"), JH & BC Corp. ("JH&BC"), 13:30

Corp. ("13:30"), D. Ronald Allen ("Allen"), Arnold Pent ("Pent"), Stewart Title of North Texas,

Inc. ("Stewart"), and Vicki Smith ("Smith") (collectively, "Defendants").  *See Plaintiff's 4th*

*Amended Original Petition* (the "Petition," at docket no. 137).  Plaintiff sued SMIC, Winterstone,

JH&BC, 13:30, Allen, and Pent (collectively, "Selling Defendants"), as well as Stewart and

Smith (collectively, "Title Defendants"), for civil conspiracy and negligence.[3]  *Id*.  Plaintiff

additionally sued SMIC for breach of contract.  *Id*.  Plaintiff also sued JH & BC, 13:30,

Winterstone, Pent, Allen, and Title Defendants for tortious interference with contract.  *Id*.

In a prior letter ruling and accompanying order, this court (1) granted summary judgment

to SMIC on the issue of breach of contract; (2) granted summary judgment to JH & BC, 13:30,

Winterstone, Pent, Allen, and Title Defendants on the issue of tortious interference with contract;

(3) granted summary judgment to Defendants on the issue of conspiracy to tortuously interfere

with contract; (4) denied Defendants' summary judgment motions on the issues of negligence

and conspiracy to breach fiduciary duty; and (5) denied Title Defendants' motion for summary

judgment on the issue of breach of fiduciary duty.  *See* docket no. 363 (the "Letter Ruling");

*Order on Defendants' Motions for Partial Summary Judgment* (the "Summary Judgment Order"),

at docket no. 366.  Thus, "the claims remaining before the court are Plaintiff's negligence claim

---

[1] "Docket no. __" shall hereinafter refer to the corresponding docket entry in the Adversary unless otherwise indicated.

[2] SMIC is one of the debtors in the jointly-administered underlying bankruptcy case, Case No. 10-40120-dml-11 (the "Case").

[3] It is not fully clear from the Petition whether Plaintiff alleges negligence (1) only against Pent; (2) against all Selling Defendants; or (3) against Pent specifically, and then against some or all of the other Selling Defendants on an agency theory.  *See* Petition at 9.  It is unnecessary to resolve this question, as the court concludes below that the facts of the Adversary do not demonstrate negligence on the part of any of the Selling Defendants.  *See also infra* note 9.  For the sake of convenience, the court will use the term "Selling Defendants" when assessing whether the SMIC-related Defendants committed negligence.

against [Selling Defendants],[4] Plaintiff's breach of fiduciary duty and negligence claims against [Title Defendants], and Plaintiff's claims for conspiracy to breach fiduciary duty against [Defendants]."  Summary Judgment Order, at 3.  The Adversary has been bifurcated such that only the issue of liability, and not the issue of damages, is currently before the court.

The court held a trial (the "Trial") in the Adversary, which took place at intermittent intervals over the course of two years.[5]  At the Trial, the court admitted documentary exhibits into evidence[6] and heard testimony from a number of witnesses.[7]  Over the course of the Trial, the court carefully assessed the credibility of the witnesses.  The court's findings are made in accordance with its assessment of the evidence.

For the reasons given below, the court reaches the following conclusions:

(1) Selling Defendants are not liable for negligence.[8]

---

[4] *See supra* note 3.

[5] The Trial took place over the following dates: May 23-25, 2011; June 29, 2011; July 13, 2011; March 5, 2012; April 23-25, 2012; April 30, 2012; May 23, 2012; and January 16, 2013.  The parties concluded with closing argument on April 23, 2013.

Transcripts from the Trial are available at docket nos. 408-12, 421, 429-32, 437, 440-41.  Transcripts of the Trial will hereinafter be cited as "TR mm/dd/yy (*name of witness, if applicable*) at __."

[6] For a list of joint exhibits admitted into evidence at the Trial, *see* docket nos. 400, 442.  "Ex. __," unless otherwise indicated, shall hereinafter refer to the corresponding joint exhibit admitted at the Trial.

[7] These witnesses included:
- Guillermo Perales ("Perales"), President of Plaintiff
- Tom Paredes ("Paredes"), a real estate broker affiliated with the J.T. Evans Company engaged by Plaintiff
- Richard J. Dobbyn ("Dobbyn"), administrative overseer, in-house director of risk management, and litigation consultant/liaison for Plaintiff
- Jeffrey Rattikin ("Rattikin"), an attorney hired by Plaintiff in connection with the 1031 Exchange (defined below)
- Jason Keen ("Keen"), former employee of N3 (defined below)
- Bryan Moore ("Moore"), an architect engaged by Plaintiff
- Smith, employee and branch vice president of Stewart who served as the escrow agent for SMIC and Plaintiff
- Pent, real estate broker, developer, and principal for SMIC
- Charles Ray Porter, Jr. ("Porter"), Plaintiff's expert witness
- Robert Edward Philo ("Philo"), Title Defendants' expert witness

[8] *See supra* note 3.

(2) Title Defendants are liable for breach of the fiduciary duty of loyalty, but not the fiduciary duty of disclosure.

(3) Because Title Defendants breached a duty owed to Plaintiff, they are also liable for negligence.

(4) Both Selling Defendants and Title Defendants are liable for civil conspiracy.

The Adversary will therefore proceed to the damages phase.[9]

As will be described in further detail below, the court exercises jurisdiction over the Adversary pursuant to 28 U.S.C. §§ 1334 and 157 as well as the parties' consent to this court's entry of a final judgment in the Adversary. *See infra* Section II.A. The following constitutes the court's findings of fact and conclusions of law pursuant to FEDERAL RULE OF BANKRUPTCY PROCEDURE 7052.

## I. FINDINGS OF FACT

The court, having reviewed the evidence admitted at the Trial, as well as *Plaintiff's Proposed Findings of Fact and Conclusions of Law* ("Plaintiff's Proposed FF/CL," at docket no. 382) and *Defendant's Proposed Findings of Fact and Conclusions of Law: Liability Phase of Trial* at docket no. 381, makes the following findings of fact by a preponderance of the evidence. All findings of fact, where appropriate, may be also construed as conclusions of law, and vice versa.

1. Plaintiff is a limited partnership organized under the laws of the State of Texas ("Texas").

2. SMIC is a limited partnership organized under the laws of Texas.

---

[9] It is not entirely clear to the court what role some Defendants (*e.g.*, Winterstone, JH & BC, etc.) played in the events surrounding the Adversary. The evidence presented at the Trial did not differentiate among each Selling Defendant. The parties are instructed to address that question during the damages phase.

3. Winterstone is a corporation organized under the laws of Texas.

4. JH&BC is a corporation organized under the laws of Texas.

5. Winterstone is the sole shareholder of JH&BC.

6. 13:30 is a corporation organized under the laws of Texas.

7. JH&BC and 13:30 are co-general partners of SMIC.

8. Allen is an individual residing in Texas.

9. Allen is the president of Winterstone and JH&BC.

10. Pent is an individual residing in Texas.

11. Pent is the president of 13:30.

12. Pent is a licensed real estate broker in Texas.

13. Stewart is a corporation organized under the laws of Texas.

14. Smith is an individual residing in Texas.

15. Smith is an escrow officer and branch vice president employed by Stewart.

16. N3 Development, Ltd. ("N3") is a limited partnership formed under the laws of Texas.

17. Highway 199 & Charbonneau Partners, Ltd. ("Hwy 199") is a limited partnership formed under the laws of Texas. The court will refer to N3 and Hwy 199 collectively as "Purchasers."

18. Purchasers were previously defendants in the Adversary, but they have been released by Plaintiff pursuant to the settlement described below.

19. Plaintiff and SMIC entered into a Contract of Sale Commercial dated July 28, 2004 (the "Contract"). Pursuant to the Contract, SMIC promised to sell to Plaintiff approximately 2.53 acres of real property (the "Property") located near the corner of Highway 199 and Charbonneau Road on the border of the cities of Lake Worth, Texas ("Lake Worth") and

Fort Worth, Texas ("Fort Worth"). The court will henceforth refer to this transaction as the "Transaction."

20. The Contract contains a flexible closing date subject to extensions and the completion of various contingencies, including the completion of a survey.

21. Allen and Pent signed the Contract on behalf of SMIC.

22. Perales signed the Contract on behalf of Plaintiff.

23. Pent acted as the principal broker for SMIC in the Transaction.

24. Paredes acted as the cooperating broker for Plaintiff in the Transaction.

25. At the time Selling Defendants entered the Transaction, they intended to sell the Property to Plaintiff.

26. Stewart served as the escrow agent for the Transaction.

27. Smith was the escrow officer/agent assigned to the Transaction.

28. The Contract was placed into escrow with Stewart on August 12, 2004.

29. The Contract required Plaintiff to deposit $10,000 earnest money (the "Earnest Money") with Stewart.

30. Stewart received the Earnest Money on August 20, 2004.

31. Smith signed the Contract on Stewart's behalf acknowledging Stewart's receipt of the Earnest Money.

32. Plaintiff planned to construct a Golden Corral Restaurant and a Popeye's Chicken Restaurant on the Property.

33. The Property is adjacent to another tract of real property (the "Adjacent Tract") which was owned and being sold by SMIC and 13:30 to N3 pursuant to a Purchase and Sale

Agreement (the "Adjacent Tract PSA") dated July 22, 2004 and amended December 20, 2004.

34. N3 planned to construct a Chase Bank and a Starbucks on the Adjacent Tract.

35. N3's development plans for the Adjacent Tract required access through the Property.

36. Plaintiff intended to finance the Transaction by generating tax benefits in conformance with 26 U.S.C. § 1031's provision for exchanges of property held for productive use or investment (the "1031 Exchange").[10]

37. Around early 2005, the parties to the Contract began to dispute whose responsibility it was to complete the survey required by the Contract.

38. The court finds that Plaintiff intentionally stalled its efforts to comply with the terms of the Contract, and intended to stall for an indefinite period of time.

39. Selling Defendants therefore began to harbor doubts that Plaintiff would expeditiously close on the Contract.

40. On February 2, 2005, Pent discussed with N3 the possibility of selling the Property to N3 instead of Plaintiff.

41. On March 1, 2005, Selling Defendants entered into a Purchase and Sale Agreement with Purchasers (the "PSA"), effective March 4, 2005, whereby Selling Defendants promised to sell both the Property and the Adjacent Tract to Purchasers. The court will henceforth refer to this transaction as the "Second Transaction."

42. Plaintiff was not a party to the PSA.

---

[10] *See generally*, *e.g.*, K. Eli Akhavan, *Artfully Deferring Taxes*, 26-AUG PROB. & PROP. 59, 59-61 (2012) (describing the purposes and mechanics of 1031 exchanges generally).

43. None of the Defendants informed Plaintiff of the PSA or took any other action to make Plaintiff aware of the PSA in March 2005 or at any time prior to the closing of the Second Transaction.

44. Title Defendants served as the escrow agent to the PSA without withdrawing from their escrow duties under the Contract.

45. Smith signed the PSA on Stewart's behalf and accepted earnest money for the Second Transaction.

46. The court infers that Title Defendants would be compensated depending on whether the Contract or the PSA closed.  That is, if the PSA closed instead of the Contract, Title Defendants would receive a commission for its services under the PSA and not the Contract, and vice versa.

47. Defendants understood that the PSA proposed to sell the subject matter of the Contract to a party other than Plaintiff.

48. The PSA included a provision (the "Confidentiality Provision," at Ex. 20 § 7.16) requiring the parties to the PSA to "keep confidential [the PSA], th[e Second Transaction], and all information learned in the course of [the Second Transaction], except to the extent disclosure is required by law or court order or to enable third parties to advise or assist [Purchasers] to investigate the Property or either party to close [the Second Transaction]."

49. The PSA includes a provision in its "Representations, Warranties and Covenants" article indicating that the Property is subject to a possible claim by Plaintiff.

50. The PSA initially included a requirement that SMIC send Plaintiff a termination letter terminating the Contract.  This provision was deleted from the final version of the PSA.

51. After Selling Defendants and Purchasers entered the PSA, Plaintiff began to suspect that Selling Defendants had taken actions to sell the Property to another party.

52. On April 5, 2005, Plaintiff informed Smith via e-mail that it had reason to believe that Selling Defendants had placed the Property under contract with another party, and requested further information.

53. Smith received this e-mail from Plaintiff and forwarded it to Pent along with a plea for help, but Smith did not respond to Plaintiff.

54. Around this time, Plaintiff attempted numerous times to contact Pent regarding the status of the Contract and the Property.  Pent did not respond.

55. As of April 5, 2005, Selling Defendants had taken no actions to formally terminate the Contract, and Plaintiff did not consider the Contract terminated.

56. Pent and Allen signed a special warranty deed (the "Special Warranty Deed") dated April 6, 2005 conveying title to the Property to Hwy 199.

57. Although an early draft of the Special Warranty Deed specified that the Property would be subject to Plaintiff's claim pursuant to the Contract, the version ultimately signed by Pent and Allen did not make any reservation for the Contract.  Pent testified that he was not aware that the final version omitted a reservation for the Contract.

58. Unlike the Special Warranty Deed, the title policy for the Second Transaction did include a reservation for the Contract.

59. The PSA closed on April 8, 2005 and was funded on April 12, 2005.

60. Up until the PSA closed, Selling Defendants would have sold the Property to Plaintiff had Plaintiff appeared ready to close to the Contract.  In other words, Selling Defendants would have been equally happy to sell the Property to either Plaintiff or Purchasers.

61. Neither Selling Defendants nor Title Defendants notified Plaintiff of the PSA before it closed and funded.

62. Pent, on at least one occasion, requested that representatives from N3 not contact Plaintiff about the PSA.

63. Selling Defendants did not at that time similarly instruct Title Defendants not to contact Plaintiff about the PSA.  Smith, after consultation with Stewart's legal department, independently decided not to inform Plaintiff of the PSA because she thought doing so would violate not only the Confidentiality Provision, but also her duties as escrow agent for the PSA.  Selling Defendants were aware of Smith's decision and in the future encouraged her to so act.

64. Accordingly, thereafter Smith did not communicate with Plaintiff.  By contrast, Smith continued to communicate regularly with Selling Defendants.

65. On April 12, 2005, only after closing and funding the PSA, Selling Defendants sent Plaintiff a letter purporting to formally terminate the Contract.  Plaintiff received this letter on April 14, 2005.

66. The court finds by a preponderance of the evidence that despite Plaintiff's delays in complying with the terms of the Contract, the Contract would have eventually closed had Selling Defendants not sold the Property to Purchasers.

67. Plaintiff entered into a settlement agreement releasing Purchasers from the Adversary in Summer 2006.

68. Title Defendants currently still hold the Earnest Money in escrow.  They have offered to return the Earnest Money to Plaintiff in settlement of the Adversary, but Plaintiff has not accepted it.

69. On January 4, 2010, SMIC filed the Case under chapter 11 of the Bankruptcy Code.[11]

   Case, at docket no. 1.

70. Plaintiff and Defendants have consented to this court entering a final judgment in the

   Adversary. *Consent for Entry of Judgment* (the "Consent," at docket no. 427).


## II. CONCLUSIONS OF LAW

*A. Jurisdiction and Authority of the Bankruptcy Court to Hear The Adversary*

1. The Adversary solely involves state law claims with, at best, a tangential relationship to

   the Case. The court therefore assumes without deciding that in the absence of the

   Consent the court would not have constitutional authority to enter final judgment in the

   Adversary under the Supreme Court's recent decision in *Stern v. Marshall*, 131 S.Ct.

   2594 (2011).

2. Courts have reached opposite conclusions regarding whether constitutional objections

   under *Stern v. Marshall* can be waived by the consent of the parties.[12]

3. The Supreme Court has granted certiorari in a case raising this issue,[13] but the Court is

   unlikely to issue an opinion in that case in the immediate future. Given that the

   Adversary has already been pending for three years, this court believes it would not be

   prudent to hold the Adversary under advisement while waiting for the Supreme Court to

---

[11] 11 U.S.C. §§ 101 *et seq.*

[12] *Compare Waldman v. Stone*, 698 F.3d 910, 917-18 (6th Cir. 2012) (no) *with Exec. Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 702 F.3d 553, 566-67 (9th Cir. 2012), *cert. granted*, 133 S.Ct. 2880 (2013) (yes).

*See generally* Stephen D. Lerner, *Recent Bankruptcy and Financial Restructuring Law: Looking to 2013*, 2013 WL 574481, at *9.

[13] *Exec. Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 133 S.Ct. 2880 (2013).

issue its decision.  The court will issue a ruling based on its own interpretation of the U.S.

Constitution and Fifth Circuit precedent.

4.  To the best of the court's knowledge, the Fifth Circuit has not directly ruled on this issue.

However, because the Fifth Circuit has held that an Article I federal magistrate judge

may constitutionally enter final judgment on a state law claim with the consent of the

parties,[14] it is likely that the Fifth Circuit would uphold a similar exercise of power by an

Article I bankruptcy judge.

5.  The court also finds persuasive the Ninth Circuit's reasoning in *Bellingham*, 702 F.3d

553, which held that the parties may waive *Stern v. Marshall* objections, and finds less

persuasive the reasoning of *Waldman*, 698 F.3d 910, which reached the contrary

conclusion.

6.  The court therefore concludes that it may constitutionally enter a final judgment in the

Adversary.


*B. Choice of Law*

7.  Texas law applies to Plaintiff's claims.


*C. Plaintiff's Negligence Claim Against Selling Defendants*

8.  A party commits negligence under Texas law when that party owes a legal duty to

another person and breaches that duty, thereby actually and proximately causing damages

to that other person.[15]

---

[14] *See Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 401, 403-07 (5th Cir. 2012).

[15] *E.g.*, *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).

9. For the following reasons, the court concludes that Selling Defendants have not committed negligence, either by negligent misrepresentation, negligent failure to disclose, or otherwise:

### 1. Negligence Liability Cannot Lie for Intentional Actions

10. "Intent and negligence are mutually exclusive; one cannot intend to injure someone by negligent conduct, and the absence of a positive intent to inflict injury is a distinguishing characteristic of negligence.  Thus, there is no claim of negligence that flows from intentionally tortious conduct."[16]

11. It appears that Selling Defendants acted intentionally in all respects when entering the Second Transaction.  Selling Defendants knew of the Contract and purposefully entered the PSA knowing that it would sell the subject matter of the Contract to a party other than Plaintiff.  That was the desired and intended effect of the Second Transaction.  Such intentional action is alone sufficient to defeat negligence liability.

12. Nevertheless, in an abundance of caution, the court will demonstrate that, even assuming *arguendo* that Selling Defendants did not act intentionally, negligence liability does not lie.

### 2. Negligent Misrepresentation

---

[16] 57A AM. JUR. 2D NEGLIGENCE § 30 (citations omitted).

> An act committed intentionally may give rise to an action in negligence if one or more harmful consequences of the act are unintended, but if there is substantial certainty that an injury will result from an act or there is a deliberate act to cause the injury, that act is an intentional act, not a negligent act.

*Id*. (citations omitted).

13. Plaintiff alleges that Selling Defendants made actionable negligent misrepresentations by failing to inform Plaintiff of (1) Selling Defendants' negotiations with Purchasers; (2) the existence of the PSA; and (3) Selling Defendants' intention to sell the Property to a party other than Plaintiff.  *See* Petition at 8-9.  This, argues Plaintiff, created the false impression that Selling Defendants still intended to close on the Contract.  *Id*.

14. Texas courts have adopted the test for negligent misrepresentation set forth in Restatement (Second) of Torts section 552.  *See*, *e.g.*, *Hagans v. Woodruff*, 830 S.W.2d 732, 735-36 (Tex. App. 1992).

15. A party alleging negligent misrepresentation

> must prove that (1) a representation [wa]s made by a defendant in the course of [its] business or in a transaction in which [it] has a pecuniary interest; (2) the defendant provide[d] "false information" for the guidance of others in [its] business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffer[ed] pecuniary loss by justifiably relying on the representation.[17]

16. "[N]egligent misrepresentation is a cause of action recognized in lieu of a breach of contract claim, not usually available where," as here, "a contract was actually in force between the parties."[18]

17. Selling Defendants avoided contact with, and thereby made no statements to, Plaintiff during the course of the negotiations and closing with Purchasers.  Therefore, Selling

---

[17] *Hagans v. Woodruff*, 830 S.W.2d 732, 735-36 (Tex. App. 1992).  *Accord, e.g.*, *Roof Sys., Inc. v. Johns Manville Corp.*, 130 S.W.3d 430, 438 (Tex. App. 2004); *Airborne Freight Corp., Inc. v. C.R. Lee Enters.*, 847 S.W.2d 289, 291, 294 (Tex. App. 1992) (citing *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).

[18] *Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640, 651 (Tex. App. 2003) (quoting *Airborne*, 847 S.W.2d at 295).

Defendants can only be found liable for negligent misrepresentations if silence, omission, failure to disclose, or concealment constitutes "false information."[19]

18. The court has not found a case squarely holding whether silence, omission, failure to disclose, or concealment constitutes negligent misrepresentation under Texas law.[20]

19. Because Texas has adopted Restatement (Second) of Torts section 552,[21] the court will consult cases from other jurisdictions citing and/or cited by Restatement (Second) of Torts section 552.

20. Most cases hold that mere omissions, silence, failure to disclose, and concealment are insufficient to satisfy the "false information" requirement of Restatement (Second) of Torts section 552.[22] Although "a partial false statement" can sometimes "make future omissions unlawful,"[23] where, as here, a "defendant provide[s] no information at all," that defendant by definition has not provided false information.[24]

---

[19] *See Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 199 (M.D.N.C. 1997) ("[P]laintiff's negligent misrepresentation claim is in reality a claim of negligent omission[.]").

[20] The plaintiff in *Harris v. Spires Council of Co-Owners*, 981 S.W.2d 892, 895-97 (Tex. App. 1998) alleged negligent omission, but the court did not squarely discuss whether that constitutes a cognizable cause of action.

[21] *Hagans*, 830 S.W.2d at 735-36.

[22] *See, e.g., Republic Bank & Trust Co. v. Bear, Stearns & Co.*, 707 F. Supp. 2d 702, 713-14 (W.D. Ky. 2010) (citations omitted); *Weber v. Sanborn*, 526 F. Supp. 2d 135, 147-48 (D. Mass. 2007); *Hill v. Allstate Ins. Co.*, 354 F. Supp. 2d 1192, 1198-99 (D. Colo. 2004); *Breeden*, 171 F.R.D. at 202; *McMullian v. Borean*, 857 N.E.2d 180, 185 (Ohio Ct. App. 2006).

*See also Kadlec Med. Ctr. V. Lakeview Anesthesia Assocs.*, 527 F.3d 412, 418-23 (5th Cir. 2008).

*But see MM Global Servs., Inc. v. Dow Chem. Co.*, 283 F. Supp. 2d 689, 706 (D. Conn. 2003); *Aliberti, LaRochelle & Hodson Eng'g Corp. v. FDIC*, 844 F. Supp. 832, 843-44 (D. Me. 1994).

[23] *Weber*, 526 F. Supp. 2d at 148. *See also infra* Section II.C.4.

[24] *Breeden*, 171 F.R.D. at 202 (citing *Mason v. Burkett*, 756 F. Supp. 679, 682 (D. Conn. 1991)).

*But see Aliberti*, 844 F. Supp. at 843-44. *Aliberti* states that because "the Restatement specifically refers to false 'information,'" it "draw[s] omissions as well as misstatements within the scope of its basis for general liability." *Id.* The court does not find *Aliberti*'s conclusion on this point, which the court reached summarily without explaining its reasoning or citing precedent, convincing. Silence unaccompanied by non-verbal cues generally does not convey

21. Of the courts that reach the contrary conclusion that silence and omission can constitute a negligent misrepresentation, most hold that liability lies only where the defendant is otherwise under a duty to disclose, such as a duty imposed by statutory law.[25]  As will be discussed below, no duty to disclose existed here.[26]

22. Moreover, Texas courts have held that "[t]he 'false information' contemplated in a negligent misrepresentation case is a misstatement of existing fact . . . A promise to act or not to act in the future cannot form the basis of a negligent misrepresentation claim."[27]  Plaintiff's claim is that "Pent made representations to [Plaintiff] *that [SMIC] was willing to sell the Property to [Plaintiff] and entered into [the Contract] and materially participated in the negotiation of th[e Contract]*."  Plaintiff's Proposed FF/CL, at 9.  Because this constitutes a promise to act in the future, Plaintiff cannot demonstrate that Selling Defendants misrepresented an existing fact.

23. Finally, Selling Defendants *did* intend to sell the Property to Plaintiff at the time they entered the Contract, and Selling Defendants were still willing to sell the Property to

---

"information."  Moreover, *Aliberti* is called into doubt by subsequent caselaw from the Supreme Judicial Court of Maine, which holds that liability for negligent omissions only lies "when such failure to disclose constitutes the breach of a statutory duty."  *Binette v. Dyer Library Ass'n*, 688 A.2d 898, 903 (Me. 1996).  In any event, *Aliberti* represents the minority position and does not bind this court.

[25] *Binette*, 688 A.2d at 903; *Mullen v. Allstate Ins. Co.*, 232 P.3d 168, 174 (Colo. App. 2009).

*See also Weber*, 526 F. Supp. 2d at 148; *Hill*, 354 F. Supp. 2d at 1198 n.4.

*But see MM*, 283 F. Supp. 2d at 705-06; *Aliberti*, 844 F. Supp. at 843-44.

[26] *See infra* Section II.C.4.

[27] *Roof Sys., Inc. v. Johns Manville Corp.*, 130 S.W.3d 430, 439 (Tex. App. 2004) (citations omitted).  *Accord Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640, 651 (Tex. App. 2003); *Airborne Freight Corp., Inc. v. C.R. Lee Enters.*, 847 S.W.2d 289, 294 (Tex. App. 1992).

*See also Hill*, 354 F. Supp. 2d at 1198-99 (interpreting RESTATEMENT (SECOND) OF TORTS § 552) (quoting *Broadview Fin., Inc. v. Entech Mgmt. Servs. Corp.*, 859 F. Supp. 444, 453 (D. Colo. 1994)).

Plaintiff up until the closing of the PSA if Plaintiff appeared willing and able to expeditiously close the Contract.[28]

24. Thus, Selling Defendants are not liable for negligent misrepresentation.

### 3. Negligence Per Se

25. As a licensed real estate broker, Pent is bound to follow the Rules of the Texas Real Estate Commission as codified in the Texas Administrative Code. *See* 22 TEX. ADMIN. CODE §§ 531.1-543.13 (2013).

26. Pursuant to these rules, "[a] real estate broker or salesperson has a special obligation to exercise integrity in the discharge of the licensee's responsibilities, including employment of prudence and caution so as to avoid misrepresentation, in any wise, by acts of commission *or omission*." 22 TEX. ADMIN. CODE § 531.2 (2013) (emphasis added).

27. Under Texas law, a defendant that injures a plaintiff by violating a penal law may be found liable for negligence per se if "the plaintiff belongs to the class that the statute was intended to protect" and "the plaintiff's injury is of a type that the statute was designed to prevent."[29]

28. Under Texas law, "negligence per se may . . . be founded upon an administrative regulation" just as it may be founded upon a legislative enactment.[30]

29. The court need not – and does not – decide that Pent violated 22 TEX. ADMIN. CODE § 531.2 by his failure to inform Plaintiff that Selling Defendants had entered the PSA and

---

[28] *Cf. Airborne Freight Corp., Inc. v. C.R. Lee Enters.*, 847 S.W.2d 289, 297 (Tex. App. 1992).

[29] *E.g., Ridgecrest Ret. & Healthcare v. Urban*, 135 S.W.3d 757, 762 (Tex. App. 2004) (citing *Perry v. S.N.*, 973 S.W.2d 301, 305 (Tex. 1998)).

[30] *Davis v. Jordan*, 305 S.W.3d 895, 897 n.1 (Tex. App. 2010) (citing *Cont'l Oil Co. v. Simpson*, 604 S.W.2d 530, 534 (Tex. App. 1980)).

no longer intended exclusively to sell the Property to Plaintiff. Assuming *arguendo* that Pent's actions violated the Texas Administrative Code, it would not constitute negligence. Under Texas law, "[a] violation of a non-penal administrative code statute does not establish a negligence per-se claim."[31] Because the Rules of the Texas Real Estate Commission are not penal in nature,[32] they cannot form the basis for a negligence claim.

30. Moreover, it is unclear whether Plaintiff belonged to the class that the Rules of the Texas Real Estate Commission are designed to protect.[33]

31. Thus, Selling Defendants may only be found liable for their silence and omissions if they owed Plaintiff an independent duty to disclose.

### 4. Fiduciary Relationships and the Duty to Disclose

32. Plaintiff argues that Selling Defendants owed Plaintiff duties to disclose (1) that they had negotiated the PSA with Purchasers and (2) that they no longer intended to consummate the Contract. Plaintiff's Proposed FF/CL at 8-9, Petition at 9.

33. Under Texas law, "[a] duty to disclose may arise in four situations: (1) when there is a fiduciary relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be

---

[31] *Ridgecrest*, 135 S.W.3d at 762. *Accord, e.g., Mann v. Geriatric Servs., Inc.*, No. 04-04-00649-CV, 2005 WL 3445987, at *6 (Tex. App. Dec. 14, 2005); *Pack v. Crossroads, Inc.*, 53 S.W.3d 492, 509-10 (Tex. App. 2001).

[32] Although the Rules of the Texas Real Estate Commission provide for administrative penalties, *see* 22 TEX. ADMIN. CODE § 535.191 (2013), Texas courts have repeatedly held that mere civil and administrative penalties are not penal in nature and cannot form the basis for negligence per se. *Mann*, 2005 WL 3445987, at *6; *Ridgecrest*, 135 S.W.3d at 762-63; *Pack*, 53 S.W.3d at 509-10. The Rules of the Texas Real Estate Commission apply criminal penalties only for unlicensed practice, *see* 22 TEX. ADMIN. CODE § 535.181 (2013); TEX. OCC. CODE § 1101.758, which is not relevant here.

[33] The regulatory duty of *fidelity* established by 22 TEX. ADMIN. CODE § 531.1 (2013) is owed largely to the principal alone, *see also* Letter Ruling at 5, but it is unclear whether the duty of *integrity* established by 22 TEX. ADMIN. CODE § 531.2 (2013) is so limited. *Compare* 22 TEX. ADMIN. CODE § 531.1 (2013) *with id.* § 531.2. *See also id.* § 535.156.

disclosed when that new information makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression."[34]

34. For the reasons described previously, duties (2) through (4) are inapplicable.[35]

35. Therefore, liability for failure to disclose can only lie if a duty to disclose arose by virtue of a fiduciary relationship between Selling Defendants and Plaintiff.

36. "There are two types of fiduciary relationships" under Texas law: "a formal fiduciary relationship that arises as a matter of law, such as principal/agent or partners, and an informal fiduciary relationship arising from a confidential relationship." *Hoggett*, 971 S.W.2d at 487 (citations omitted).

37. For the following reasons, neither a formal nor an informal fiduciary relationship existed between Selling Defendants and Plaintiff:

### a. Formal Fiduciary Relationships

38. No formal fiduciary relationship existed here because under Texas statutory and case law "a real estate brokerage contract creates a fiduciary relationship *only* between the principal and the broker . . . The broker owes duties of good faith and full disclosure *only* to the principal."[36]

---

[34] *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App. 1997). *See also*, *e.g.*, *Anderson v. Griffith*, 501 S.W.2d 695, 699-701 (Tex. App. 1973).

Though *Hoggett* discusses the duty to disclose in the context of fraud rather than negligence, *see* 971 S.W.2d at 486-89, the parties and the court agree that the case and the duty it establishes are equally relevant in the negligence context. *Compare* Plaintiff's Proposed FF/CL at 8 *with [Pent's] Trial Brief on the Element of Duty as to Plaintiff's Negligence Claim – Duty to Disclose* at docket no. 377, at 2-3 n.1, n.3. *See also* Letter Ruling at 5-6.

[35] *See supra* Section II.C.2.

[36] Letter Ruling at 5 (emphasis added) (citing 22 TEX. ADMIN. CODE §§ 531.1, 535.156(a) (2013); *Janes v. CPR Corp.*, 623 S.W.2d 733, 740 (Tex. App. 1981); *Anderson*, 501 S.W.2d at 701). *But see supra* note 33.

39. Plaintiff, as the prospective buyer, was not the principal to the brokerage contract. Selling Defendants therefore owed Plaintiff no formal fiduciary duty.

### b. Informal Fiduciary Relationships

40. Under Texas law, an informal fiduciary duty arises pursuant to a confidential relationship where one party "is justified in placing confidence in the belief that another party will act in his or her best interest" because the first party "is accustomed to being guided by the judgment or advice of the other party, and there exists a long association in a business relationship, as well as personal friendship." *Hoggett*, 971 S.W.2d at 488 (citations omitted).

41. "A fiduciary relationship is an extraordinary one and will not be lightly created; the mere fact that one subjectively trusts another does not alone indicate that" an informal fiduciary relationship exists. *Hoggett*, 971 S.W.2d at 488.

42. The mere existence of the Contract is insufficient to impose a fiduciary duty upon Selling Defendants; "something apart from the transaction between the parties is required." *Hoggett*, 971 S.W.2d at 488 (citations omitted).

43. The record does not evince a relationship between Plaintiff and Selling Defendants stronger than a mere contractual relationship.

44. To the contrary, "their relationship became increasingly one of mistrust and acrimony," which precludes a confidential relationship. *Hoggett*, 971 S.W.2d at 491.

45. Therefore, no informal fiduciary relationship existed.

46. "In the absence of a fiduciary relationship, either formal or informal," Selling Defendants "simply had no duty to disclose" the existence of the PSA. *Hoggett*, 971 S.W.2d at 489.

20

*5. General Negligence*

47. Plaintiff also pleads that Selling Defendants had general duties "not to act negligently or incompetently and to avoid engaging in conduct that was dishonest or in bad faith or that demonstrates untrustworthiness," that Selling Defendants breached to Plaintiff's injury. Petition at 9.

48. Given this court's conclusion that Selling Defendants did not breach a duty to disclose or make a negligent representation, liability may only lie if Selling Defendants' willful failure to consummate the Contract by selling the property to a third party constitutes negligence.

49. This court has previously granted Selling Defendants summary judgment on Plaintiff's breach of contract claim because the Contract includes a provision whereby "Plaintiff intended to relinquish its right to sue SMIC for breach of contract damages should SMIC default on its contractual obligations."[37] Thus, SMIC and Pent may only be found liable for negligence if they have committed an actionable tort distinct from the mere breach of a contract.

50. Under Texas law, it is *not* the case that "accompanying every contract is a common law duty to perform the contract with care, skill, reasonable expedience, and faithfulness."[38] The Supreme Court of Texas has held that "if the defendant's conduct . . . would give rise

---

[37] Letter Ruling at 2-3; *see also* Summary Judgment Order at 2-3.

[38] *Dolenz v. Old Republic Ins. Co.*, No. 05-94-00681-CV, 1995 WL 238434, at *4 (Tex. App. 1995) (not designated for publication).

*See also Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987) (declining "to impose an implied covenant of good faith and fair dealing in every contract" absent a special relationship between the parties (emphasis omitted)) (citing *Manges v. Guerra*, 673 S.W.2d 180, 183 (Tex. 1984)).

to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract" unless the contract imposes a special relationship.[39]

51. As discussed above, no special relationship existed between Plaintiff and Selling Defendants.[40]

52. Whereas "misfeasance or negligent affirmative conduct in the performance of the promise generally subjects an actor to tort liability as well as contract liability . . . there is no tort liability for nonfeasance, i.e., for failing to do what one has promised to do in the absence of a duty to act apart from the promise made."[41]

53. Like the plaintiff in *DeLanney*, "[a]lthough Plaintiff pleaded [its] action as one in negligence, [it] clearly sought to recover the benefit of [its] bargain with [Selling Defendants]." 809 S.W.2d at 495. Where, as here, "the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract" alone. *Id*. at 494-95 (citations omitted). Because Plaintiff's damages "were only for the economic loss caused by [Selling Defendants'] failure to perform," Plaintiff's claim lies "solely in contract." *Id*. at 495.

---

[39] *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991). *Accord, e.g., Myers v. Ford Motor Credit Co.*, Civil Action No. 3:09-CV-2271-L, 2010 WL 2730640, at *2-3 (N.D. Tex. 2010); *Dolenz*, 1995 WL 238434, at *4. *Cf. Bodnar v. Impression Bridal, Inc.*, Civil Action No. H-09-2493, 2010 WL 346132, at *4-5 (S.D. Tex. 2010) (applying *DeLanney* in the context of fraud rather than negligence).

[40] *See supra* Section II.C.4.

[41] *DeLanney*, 809 S.W.2d at 495 n.2 (citing W. KEETON, D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEATON ON THE LAW OF TORTS § 92 at 656-57 (5th ed. 1984)).

54. Also like the plaintiff in *DeLanney*, Plaintiff "waived any claim for breach of contract." *Id*.  *See also* Letter Ruling at 2-3.  As a result, under Texas law, Plaintiff is prohibited from succeeding on its failed breach of contract claim by recasting it as a tort claim.[42]

55. Selling Defendants are therefore not liable for negligence.

### D. Plaintiff's Negligence and Breach of Fiduciary Duty Claims Against Title Defendants

56. Plaintiff argues that Title Defendants, as escrow agent for the Transaction, owed Plaintiff fiduciary duties.  By also acting as the escrow agent for the PSA, Plaintiff argues, Title Defendants breached those duties and therefore are liable for negligence, breach of fiduciary duty, or both.

57. "The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant."[43]

58. The elements of negligence are set forth above.[44]

59. The major difference between negligence and breach of fiduciary duty under Texas law is that benefit to the defendant in the absence of injury to the plaintiff is insufficient to

---

[42] *See*, *e.g.*, *Airborne Freight Corp., Inc. v. C.R. Lee Enters.*, 847 S.W.2d 289, 291 (Tex. App. 1992) ("This case involves a contract dispute, and there's the rub.").

[43] *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App. 2006) (citing *Punts v. Wilson*, 137 S.W.3d 889, 891 (Tex. App. 2004)).

[44] *See supra* Section II.C.

establish negligence but sufficient to establish breach of fiduciary duty, assuming the other elements of the cause of action are satisfied.[45]

### 1. Duties of an Escrow Agent

60. Appellate courts in Texas have reached divergent conclusions regarding what duties an escrow agent owes to parties to an escrow transaction.[46] A few courts hold that "[a]n escrow agent's duties are strictly limited to those set forth in the escrow agreement."[47] A greater number holds that escrow agents owe robust duties of loyalty, disclosure, and good faith independent of the terms of the escrow agreement.[48] Still others list both of these propositions side by side without resolving the tension between them.[49]

61. This court has previously reconciled these cases by noting that "all Texas Courts of Appeals that have addressed the issue at least agree that an escrow agent is a neutral party

---

[45] *Compare Jones*, 196 S.W.3d at 447 (citing *Punts*, 137 S.W.3d at 891) *with Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).

[46] Letter Ruling at 3-4.

Texas courts are not the only authorities reaching conflicting conclusions on this difficult issue. *Compare* 28 AM. JUR. 2D ESCROW § 22 ("the escrow agent's duty is limited by the terms of the escrow agreement; the escrowee owes a duty to act only in accordance with the escrow instructions" (citations omitted)) *with id.* § 23 ("an escrow agent owes fiduciary duties to both the buyers and the sellers of the property, including the duty of loyalty, the duty to make full disclosure, and the duty to exercise a high degree of care to conserve the money placed in escrow").

[47] *See, e.g., Jones*, 196 S.W.3d at 448 (Tex. App. 2006) (citing *Equisource Realty Corp. v. Crown Life Ins. Co.*, 854 S.W.2d 691, 697 (Tex. App. 1993)); *Chapman Children's Trust v. Porter & Hedges LLP*, 32 S.W.3d 429, 438 (Tex. App. 2000).

*Cf. Hinton v. Fed. Nat'l Mortg. Ass'n*, 945 F. Supp. 1052, 1060 (S.D. Tex. 1996) ("An escrow account carries no global fiduciary responsibilities.").

[48] *See, e.g., Home Loan Corp. v. Tex. Am. Title Co.*, 191 S.W.3d 728, 731-33 (Tex. App. 2006); *Bell v. Safeco Title Ins. Co.*, 830 S.W.2d 157, 161 (Tex. App. 1992) (citing *Trevino v. Brookhill Capital Res., Inc.*, 782 S.W.2d 279, 281 (Tex. App. 1989)); *Zimmerman v. First Am. Title Ins. Co.*, 790 S.W.2d 690, 695 (Tex. App. 1990).

[49] *See, e.g., Shoalmire v. U.S. Title of Harrison Cnty.*, No. 06-09-00034-CV, 2010 WL 271302, at *5 (Tex. App. 2010); *Trahan v. Lone Star Title Co. of El Paso, Inc.*, 247 S.W.3d 269, 287 (Tex. App. 2007).

owing fiduciary duties to both buyer and seller."[50]  Accordingly, Title Defendants owed

"fiduciary duties of loyalty and disclosure" to Plaintiff.  Letter Ruling at 3-4.

62.  Although the Summary Judgment Order is an interlocutory order that the court is

permitted to reconsider if erroneous,[51] the court has found no case that would lead it to

alter its previous conclusion.  There is simply no "rationale for limiting [an escrow]

agent's fiduciary duties to only those set forth in a written contract."[52]  Cases to the

contrary are either in tension with Texas Supreme Court precedent[53] or have been called

into doubt by subsequent case law from the same appellate court.[54]  The court therefore

---

[50] Letter Ruling at 3-4.

*Accord, e.g.*, *Shoalmire*, 2010 WL 271302, at *5; *Trahan*, 247 S.W.3d at 287; *Home Loan*, 191 S.W.3d at 731-33; *Chapman*, 32 S.W.3d at 438; *Bell*, 830 S.W.2d at 161; *Zimmerman*, 790 S.W.2d at 695; *Trevino*, 782 S.W.2d at 281 (citing *City of Fort Worth v. Pippen*, 439 S.W.2d 660 (Tex. 1969)).

*See also Equisource*, 854 S.W.2d at 696-97 (explaining that "[t]he escrow agent owes fiduciary duties to buyer and seller" without defining what those duties entail).

[51] *See, e.g., Louisiana v. Guidry*, 489 F.3d 692, 698 (5th Cir. 2007) (citations omitted).

[52] *Home Loan*, 191 S.W.3d at 733.

This is because

> (1) fiduciary duties arise as a matter of law, not contract; (2) they exist in special relationships in which a high degree of trust warrants that the fiduciary's conduct be measured by higher standards than ordinary contractual dealings between parties and that those standards not be "whittled down by exceptions;" and (4) [sic] contracts between fiduciaries and those to whom they owe a fiduciary duty carry a presumption of unfairness.

*Id*. (citations omitted).

[53] *Compare Hinton v. Fed. Nat'l Mortg. Ass'n*, 945 F. Supp. 1052, 1060 (S.D. Tex. 1996) (flatly stating, without citation to case or statutory law, that "[a]n escrow account carries no global fiduciary responsibilities"); *Jones v. Blume*, 196 S.W.3d 440, 448 (Tex. App. 2006) (holding that a written agreement is necessary to create an escrow agent relationship); *Chapman*, 32 S.W.3d at 438 (same) *with Pippen*, 439 S.W.2d at 664-65 (deeming a written escrow agreement unnecessary to create fiduciary duties); *Home Loan*, 191 S.W.3d at 731 (interpreting *Pippen* accordingly).

[54] The Court of Appeals of Texas, Houston (14th Dist.), for example, had at first adopted a strict interpretation of an escrow agent's fiduciary duties, but now defines the duties very broadly.  *Compare Chapman*, 32 S.W.3d at 438 *with Home Loan*, 191 S.W.3d at 731-33.

remains convinced that Title Defendants owed Plaintiff fiduciary duties of loyalty and disclosure under Texas law.[55]

63. The Texas Supreme Court has described an escrow's disclosure duty as a "duty of *full disclosure*," which appellate courts in Texas have interpreted to mean that an escrow agent owes "the conventional fiduciary duty of full disclosure" owed by fiduciaries outside the escrow context.[56]  As a result, the escrow agent must disclose to both parties "all material facts known to the fiduciary that might affect the rights of the person to whom the duty is owed."[57]

---

The Court of Appeals of Texas, Dallas has also recently reaffirmed, despite prior case law suggesting the contrary, that an escrow agent's duties are not limited to those explicitly set forth in the escrow agreement.  *Compare Equisource*, 854 S.W.2d at 697 *with Holder-McDonald v. Chicago Title Ins. Co.*, 188 S.W.3d 244, 248 (Tex. App. 2006).

[55] Title Defendants argue that *Home Loan's* holding that fiduciary duties are not limited to those explicitly set forth in a written escrow agreement is inapposite because the Adversary, unlike *Home Loan*, involves a "classic example of a 'true escrow' in which competing limited fiduciary duties are owed to both parties of the transaction." *[Title Defendants'] Trial Brief – Duties of Escrow Agent* ("Title Defendants' Duty Brief," at docket no. 379) at 6.

This distinction is illusory.  *Home Loan* holds that "an escrow agent or any other type of closing or settlement agent" owes fiduciary duties that arise as a matter of law, *not* by virtue of the terms or form (or even the existence of) a formal escrow agreement, and these duties should "not be 'whittled down by exceptions.'" 191 S.W.3d at 733 (citations omitted).  *See generally Pippen*, 439 S.W.2d 660 (Tex. 1969).  The court is not to draw fine distinctions based on the particularities of any given escrow arrangement.

The only time the form of an agreement may limit an escrow agent's duties is where the agent serves in two or more distinct capacities.  Thus, for example, where an entity serves as both escrow agent and title insurer, the escrow agent's fiduciary duties extend only to the escrow activities and not to the title insurance activities.  *See Holder-McDonald*, 188 S.W.3d at 248.  That does not mean that those fiduciary duties do not exist or are not applicable to the agent's escrow activities.

[56] *Home Loan*, 191 S.W.3d at 732 (emphasis in original) (quoting *Pippen*, 439 S.W.2d at 665).

[57] *Id*. at 731.

*But see infra* Section II.D.2.b.

64. An escrow agent "must act with utmost good faith and avoid any act of self-dealing that places his [or her] personal interest in conflict with his [or her] obligations to the beneficiaries" of the escrow agreement.[58]

65. An escrow agent is obligated to do (and avoid doing) what a hypothetical escrow agent of ordinary prudence would do (or not do) under the same or similar circumstances.[59]

66. However, "the 'hornbook law' of agency is not necessarily applicable to escrow agents. Although sharing the name 'agent,' general agents and escrow agents are dissimilar in one important respect: a general agent is forbidden from having conflicting interests, but an escrow agent necessarily serves two conflicting principals."[60] As a result, the fiduciary duties owed by escrow agents are limited in several important respects:[61]

67. Because an "escrow agent owes a fiduciary duty to both parties of the escrow contract," the escrow agent must act "as a neutral third party" that avoids favoring either side of the transaction.[62]

68. Also, the duties of an escrow agent employed to close a transaction are limited to "matters affecting the parties' rights in the closing process;" they do not extend to the "merits of the underlying transaction."[63]

---

[58] *Trevino v. Brookhill Capital Res., Inc.*, 782 S.W.2d 279, 281-82 (Tex. App. 1989) (citing *Slay v. Burnett Trust*, 187 S.W.2d 377, 387-88 (Tex. 1945)). *Accord Bell v. Safeco Title Ins. Co.*, 830 S.W.2d 157, 161 (Tex. App. 1992); 28 AM. JUR. 2D ESCROW § 23.

[59] *Trevino*, 782 S.W.2d at 283.

[60] *Equisource Realty Corp. v. Crown Life Ins. Co.*, 854 S.W.2d 691, 696-97 (Tex. App. 1993).

[61] *See generally* 28 AM. JUR. 2D ESCROW § 23.

[62] *Bell*, 830 S.W.2d at 161 (Tex. App. 1992) (citing *Vector Indus., Inc. v. Dupre*, 793 S.W.2d 97, 101 (Tex. App. 1990)).

[63] *Home Loan Corp. v. Tex. Am. Title Co.*, 191 S.W.3d 728, 733-34 (Tex. App. 2006). *Accord Shoalmire v. U.S. Title of Harrison Cnty.*, No. 06-09-00034-CV, 2010 WL 271302, at *5 (Tex. App. 2010).

69. Finally, "[a]n escrow agent has no 'independent duty to determine the correctness of [documentation] provided by a title company.'"[64]

70. Smith's conduct is attributable to Stewart by virtue of the principal-agent relationship between employer and employee established by the doctrine of *respondeat superior*. *E.g.*, Letter Ruling at 4.

## *2. Breach*

### *a. Breach of Duty of Loyalty*

71. For the following reasons, the court concludes that Title Defendants breached their fiduciary duty of loyalty by serving as escrow agent for the PSA:

72. By acting as escrow agent for the PSA, Title Defendants breached their duty to act "as a neutral third party"[65] by favoring Selling Defendants' interests over Plaintiff's interests. Title Defendants should have never agreed to serve as the escrow agent for the PSA, or at least should have withdrawn from the Second Transaction.[66]

73. Title Defendants argue that "an escrow agent's duties owed in one transaction do not extend to a different transaction" "to which Plaintiff is not a party," and that Title Defendants' actions respecting the PSA could therefore not have breached their duties to

---

[64] *Shoalmire*, 2010 WL 271302, at *5 (Tex. App. 2010) (quoting *Holder-McDonald v. Chicago Title Ins. Co.*, 188 S.W.3d 244, 248 (Tex. App. 2006)).

[65] *Bell*, 830 S.W.2d at 161 (citing *Vector*, 793 S.W.2d at 101).

[66] The court questioned Smith at the Trial whether she had ever declined or withdrawn from an escrow arrangement on the basis of a concern that acting as the escrow agent would interfere with her obligations to other parties. TR 1/16/13 (Smith) at 22-26. Her response indicated that she had previously withdrawn from escrow arrangements not materially different from this one out of fear of potential legal consequences. *Id.* This bolsters the court's conclusion that Smith could have – and should have – declined or withdrawn from the escrow arrangement here.

Plaintiff.[67]  This conception of an escrow agent's fiduciary duties is overly myopic. Because the Contract and the PSA reference the same subject matter – namely, the Property – any action Title Defendants took with respect to one of the escrow agreements would necessarily "affect[] the parties' rights in the closing process" of the other and thereby trigger Smith and Stewart's fiduciary duties.  *Home Loan*, 191 S.W.3d at 733-34. The Transaction and the Second Transaction are inextricably linked.

74. Nor does the PSA's provision in its "Representations, Warranties and Covenants" article indicating that the Property is subject to a possible claim by Plaintiff affect the court's conclusion that Title Defendants breached their duty of loyalty.  Even if the PSA preserved some of Plaintiff's remedies or legal rights, Title Defendants still impermissibly favored Selling Defendants over Plaintiff in violation of its duty of neutrality.

75. Therefore, Title Defendants improperly committed an "act of self-dealing that place[d] [their] personal interest in conflict with [their] obligations to" Plaintiff.[68]

### b. Breach of Duty of Disclosure

76. By contrast, the court is unable to conclude that Title Defendants breached their duty of disclosure.

77. As noted above, under Texas law an escrow agent owes its principals the duty of full disclosure.[69]  This, at first blush, could suggest that Title Defendants breached their

---

[67] Title Defendants' Duty Brief at 7 (citing *Home Loan*, 191 S.W.3d at 733-34).

[68] *Trevino v. Brookhill Capital Res., Inc.*, 782 S.W.2d 279, 281-82 (Tex. App. 1989) (citing *Slay v. Burnett Trust*, 187 S.W.2d 377, 387-88 (Tex. 1945)).

[69] *Home Loan*, 191 S.W.3d at 732 (emphasis in original) (quoting *City of Fort Worth v. Pippen*, 439 S.W.2d 660, 665 (Tex. 1969)).

disclosure duty by failing to disclose to Plaintiff the PSA and their relationship with respect to it.

78. However, the fact that an escrow agent necessarily serves two principals complicates the disclosure inquiry.[70]  In a typical agency relationship between a single agent and a single principal, the agent is freely able – and therefore required – to disclose to the principal all material facts within the agent's knowledge that might affect the principal's rights.[71]  By contrast, when a single agent serves two principals, and that agent obtains material information involving the first principal that could affect the second principal's rights, it is unclear whether the agent may disclose the information to the second principal.  The duty of confidentiality and loyalty to the first principal is in tension with the duty of disclosure to the second.[72]  It is not intuitively obvious how a court should resolve these competing considerations.

79. This question is further complicated in the Adversary by the Confidentiality Provision, which purports to prohibit Title Defendants from disclosing the PSA to Plaintiff, except as otherwise required by law or court order.

80. The court, despite intensive research, has not located a Texas case in which an escrow agent has been found liable for breaching its disclosure duty in circumstances even remotely resembling the facts of the instant case.  The court is reluctant to rule that Title Defendants have breached their disclosure duty in the absence of Texas case law suggesting that imposing liability would be proper here.

---

[70] *See, e.g., Equisource Realty Corp. v. Crown Life Ins. Co.*, 854 S.W.2d 691, 696-97 (Tex. App. 1993).

[71] *Cf., e.g., Home Loan*, 191 S.W.3d at 731.

[72] *See, e.g., Burkons v. Ticor Title Ins. Co. of Cal.*, 813 P.2d 710, 718 (Ariz. 1991).

81. An examination of cases from other jurisdictions that impose duties on escrow agents similar to those imposed under Texas law[73] further indicates that imposing liability for failure to disclose as averred in the Adversary would be improper.  These cases resolve the conflict between the escrow agent's duty of disclosure to one principal and the duty of confidentiality and loyalty to the other[74] as follows: An escrow agent has "no duty to disclose information" regarding the other principal "unless such a duty is required by the terms of the agreement" or "when the escrow agent [k]nows that a fraud is being committed on a party to an escrow and the failure of the escrow agent to disclose the information of the fraud will assist in accomplishing the fraud."[75]

82. Thus, Title Defendants are not liable for breach of the duty of disclosure unless one of these two exceptions applies.

83. The Contract contains no terms requiring Title Defendants to disclose the existence of the PSA to Plaintiff.

84. Nor can the court conclude that Title Defendants had actual knowledge that Selling Defendants intended to commit fraud upon Plaintiff.  The Petition does not allege fraud, and it is not clear the court would find fraud even if Plaintiff alleged it.

85. Thus, no exception is applicable here.

86. The court therefore cannot conclude that Title Defendants breached their duty to disclose.

87. However, because Title Defendants breached their duty of loyalty, the court will analyze the remaining elements of injury and causation.

---

[73] *Compare*, *e.g.*, *Thornton v. Chi. Title Ins. Co.*, No. 1 CA-CV 10-0014, 2011 WL 540287, at *3 (Ariz. Ct. App. Feb. 15, 2011) (citations omitted) (describing the fiduciary duties imposed upon escrow agents under Arizona law) *with*, *e.g.*, *supra* Section II.D.1. (describing the fiduciary duties imposed upon escrow agents under Texas law).

[74] *See*, *e.g.*, *Burkons*, 813 P.2d at 718.

[75] *Berry v. McLeod*, 604 P.2d 610, 616 (Ariz. 1979).  *Accord*, *e.g.*, *Burkons*, 813 P.2d at 718-19 (Ariz. 1991).

31

### 3. Injury to Plaintiff/Benefit to Defendants

88. Because the Adversary has been bifurcated into a liability phase and a damages phase, the court reaches no conclusion as to the quantum of damages at this stage. The court merely notes that, for the following reasons, Plaintiff has satisfied the injury/benefit element of negligence/breach of fiduciary duty by proving at the Trial that it has sustained some amount of damages greater than zero:

### a. Injury to Plaintiff

89. Plaintiff has sustained at least some injury from, *inter alia*, losing the opportunity to timely close on the Contract, losing the ability to take legal measures to protect its rights in the Contract before Defendants closed on the PSA, and incurring expenses pursuing legal recourse against Purchasers.

90. The evidence introduced at the Trial indicates that Plaintiff may not have timely complied with all the terms of the Contract. The evidence also raises a question whether Plaintiff could have timely consummated the 1031 Exchange. Thus, in the damages phase of the trial, Title Defendants may be able to prove that Plaintiff could have and should have mitigated some of its damages.

91. Moreover, as will be discussed below,[76] it is not clear what portion of Plaintiff's injury can be traced to Title Defendants' breach of loyalty, which the court has ruled is actionable, and how much should instead be traced to Title Defendant's failure to disclose the PSA's existence, which is not.

---

[76] *See infra* Section II.D.4.

92. However, although this may ultimately be a reason to reduce a damage award, I cannot conclude at this phase that Plaintiff has sustained no damages whatsoever.  Defendants' breach put Plaintiff in a worse position than it would have been absent the breach, which is all Plaintiff needs to satisfy this element.

93. The same may be said of Defendants' argument that Plaintiff is entitled to nothing due to "Plaintiff's failure to enforce specific performance against [Purchasers] and . . . its voluntary release of its claims against [Purchasers] and the Property."[77]  That might reduce the award to which Plaintiff is entitled – the court reaches no decision on the matter at this point – but that does not entail that Plaintiff did not incur damages despite reaching the settlement with Purchasers.

### b. Benefit to Defendants

94. Breach of fiduciary duty is broader than negligence insofar as it countenances a remedy not only when the plaintiff is injured, but also when the defendant has benefited from the breach.[78]

95. Title Defendants benefited from their breach of fiduciary duty because they received financial and other benefits by serving as an escrow agent for both the Transaction and the Second Transaction.  This amounts to impermissible self-dealing.[79]

---

[77] *[Title Defendants'] Trial Brief – [Hwy] 199 and N3 Were Not Bonafide [sic] Purchasers for Value, And Their Rights Were Subject to Plaintiff's Right to Enforce Specific Performance*, at docket no. 380, at 5.

[78] *See*, *e.g.*, *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App. 2006) (citing *Punts v. Wilson*, 137 S.W.3d 889, 891 (Tex. App. 2004)).

[79] *See*, *e.g.*, *Trevino v. Brookhill Capital Res., Inc.*, 782 S.W.2d 279, 281-82 (Tex. App. 1989).

96. Subject to meeting its burden at the damages phase of the Adversary, Plaintiff may be able to obtain disgorgement of any profits Title Defendants wrongfully earned from the Second Transaction, which they had no right to enter.[80]

### 4. Actual and Proximate Causation

97. Under Texas law, a defendant proximately causes a plaintiff injury when (1) the breach is the cause in fact of that injury and (2) the injury was foreseeable.[81]

98. Title Defendants' breach of loyalty actually caused Plaintiff's injury and allowed Title Defendants to profit at Plaintiff's expense.[82]

99. Title Defendants could have and should have foreseen that their breach would cause Plaintiff injury.[83]

100. Therefore, Title Defendants proximately caused Plaintiff's injury.

101. It is unclear how much Plaintiff's injury stems from Title Defendant's breach of loyalty, which this court has ruled is actionable, and how much instead stems from Title Defendant's failure to disclose the PSA to Plaintiff, which is not. It is therefore open to Title Defendants at the damages phase to argue that Plaintiff has no recourse for that portion of its alleged injury traceable to Title Defendants' nondisclosure.

102. Nevertheless, because Title Defendants breached the fiduciary duty owed by escrow agents to parties to the escrow transaction, and because that breach both

---

[80] *Cf.*, *e.g.*, *Taylor v. Alonso, Ceronsky & Garcia, P.C.*, No. 01–11–00078–CV, 2012 WL 3773041, at *10 n.6 (Tex. App. Aug. 30, 2012). Unlike the plaintiff in *Taylor*, Plaintiff may potentially recover disgorged profits because it explicitly requested equitable relief in the Petition. *See* Petition at 9.

[81] *See*, *e.g.*, 53 TEX. JUR. 3D NEGLIGENCE § 19.

[82] *See*, *e.g.*, *id.* § 22.

[83] *See*, *e.g.*, *id.* § 23.

proximately caused at least some injury to Plaintiff and allowed Title Defendants to reap

some financial and other benefits, Title Defendants are liable to Plaintiff for both

negligence and breach of fiduciary duty.

## E. Conspiracy to Breach Fiduciary Duty

103.    Plaintiff alleges that Defendants conspired to breach the fiduciary duty Title

Defendants owed to Plaintiff.

104.    "The elements of a civil conspiracy are: (1) two or more persons; (2) an object to

be accomplished; (3) a meeting of the minds; (4) one or more unlawful, overt acts; and

(5) damages as the proximate result."[84]

105.    Negligence cannot form the basis for conspiracy liability.  "Because negligence is

by definition not an intentional wrong, one cannot agree or conspire to be negligent."[85]

106.    By contrast, "[b]reach of fiduciary duty is a recognized cause of action that will

support a civil conspiracy claim" under Texas law.[86]

107.    A third party may be liable for conspiracy to breach fiduciary duty even where

that third party does not itself owe a fiduciary duty to the plaintiff.  "[W]here a third party

knowingly participates in the breach of duty of a fiduciary, such third party becomes a

---

[84] *E.g.*, *Lesikar v. Rappeport*, 33 S.W.3d 282, 301 (Tex. App. 2000) (citing *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983); *Facciola v. Linbeck Constr. Corp.*, 968 S.W.2d 435, 444-45 (Tex. App. 1998)).

[85] *E.g.*, *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996).

[86] *E.g.*, *Malone v. Malone*, No. 2-08-157-CV, 2009 WL 2579629, at *4 (Tex. App. Aug. 20, 2009) (citing *Lesikar*, 33 S.W.3d at 302).

joint tortfeasor with the fiduciary and is liable as such."[87]  Thus, Selling Defendants may

be found liable for conspiracy even though they owed Plaintiff no fiduciary duty.

108.        A plaintiff may – and often must – prove conspiracy by circumstantial evidence.[88]

"When [entities] enter into conspiracies, they are not likely to call in a witness . . . Their

purpose is imposition and deception; and secrecy is necessary to its accomplishment.  In

such cases the injured party must necessarily have recourse to circumstantial evidence."[89]

Accordingly, "[t]he general rule is that conspiracy liability is sufficiently established by

proof showing concert of action or other facts and circumstances from which the natural

inference arises that the unlawful, overt acts were committed in furtherance of common

design, intention, or purpose of the alleged conspirators."[90]

### *1. Two or More Persons*

109.        Central to the "two or more persons" element is the requirement that co-

conspirators be separate entities.  "A conspiracy cannot exist between a principal and an

agent" because "[t]he identity between an agent and principal leads to a legal

---

[87] *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) (citing 2 Tex. Jur. 557; *Miller v. Himebaugh*, 153 S.W. 338 (Tex. Civ. App. 1913); *William Cameron & Co. v. Blackwell*, 115 S.W. 856 (Tex. Civ. App. 1909)).

*Cf. Joe W. and Dorothy Dorsett Brown Found. V. Frazier Healthcare V, L.P.*, 889 F. Supp. 2d 893, 897-98 (W.D. Tex. 2012) (applying Delaware law) ("[Conspiracy] holds a third party, not a fiduciary, responsible for violation of a fiduciary duty." (quoting *Albert v. Alex. Brown Mgmt. Servs.*, Nos. 762-N, 763-N, 2005 WL 2130607, at *10 (Del. Ch. Aug. 26, 2005)).

[88] *E.g.*, *Lesikar*, 33 S.W.3d at 302 (citing *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W. 2d 567 (Tex. 1963); *Fisher v. Yates*, 953 S.W.2d 370, 379 (Tex. App. 1997)).

[89] *Jernigan v. Wainer*, 12 Tex. 189, 193 (Tex. 1854).

[90] *Int'l Bankers*, 368 S.W. 2d at 581-82 (citations omitted).

impossibility in the context of conspiracy."[91]  Accordingly, "agents and employees of a corporation cannot conspire with their corporate principal;"[92] "[e]mployees of a company are not liable for conspiracy so long as the employee is acting within the scope of his or her employment;"[93] a parent company cannot conspire with its subsidiary;[94] etc.

110.     As a result, Selling Defendants by definition cannot conspire amongst themselves. Nor can Title Defendants.[95]  Conspiracy liability may only lie if Selling Defendants, or at least some of them, constitute a separate entity from Title Defendants.

111.     This question is complicated by the court's prior conclusion that escrow agents owe fiduciary duties, albeit limited ones, to their principals.  Title Defendants were agents of Selling Defendants just as they were agents of Plaintiff.  If agents by definition cannot conspire with their principals, can an escrow agent be found liable for conspiring with one of its principals against the other while acting in its capacity as escrow agent?[96]

---

[91] *E.g.*, 15A C.J.S. CONSPIRACY § 10 (citations omitted).

[92] *Id.* (citations omitted).

*Accord, e.g.*, *Fojtik v. First Nat'l Bank of Beeville*, 752 S.W.2d 669, 673 (Tex. App. 1988) (citing *Christopher v. Gen. Computer Sys.*, 560 S.W.2d 698, 709 (Tex. App. 1977)).

[93] *E.g.*, 15A C.J.S. CONSPIRACY § 10 (citations omitted).

[94] *E.g.*, *Atl. Richfield Co. v. Misty Prods., Inc.*, 820 S.W.2d 414, 420-21 (Tex. App. 1991) (citations omitted).

[95] *See Elder v. Calvary Credit Corp.*, No. 14-96-00099-CV, 1997 WL 528990, at *7 (Tex. App. Aug. 28, 1997) (not designated for publication) (holding that escrow officer could not conspire with escrow agent that employed him).

[96] Had Defendants engaged in a conspiracy unrelated to Plaintiff's rights in the closing process, this question would not arise.  Texas conspiracy law contemplates that a conspiracy can occur between an agent and its principal when the agent is acting outside of its capacity as agent.  *See Fojtik*, 752 S.W.2d at 673 ("[I]t is conceivable that Chestnut, if he had in fact conspired with the bank, did so in his capacity not as a corporate agent but as an independent equipment dealer.").  *Accord* 15A C.J.S. CONSPIRACY § 20.  So, to invent an extreme example, if Pent and Smith conspired to take a baseball bat to Perales's kneecaps for reasons unrelated to the Contract, there would be no question that Pent and Smith could be liable for civil conspiracy to batter (among other torts and crimes) notwithstanding their agency relationship.  By contrast, conspiracy to breach fiduciary duty by definition concerns actions taken by the agent in its fiduciary capacity and therefore directly raises the question of whether such a conspiracy is even logically possible.  *See id.*

37

112.      The court has found no Texas case directly or indirectly addressing this

question,[97] but cases from other jurisdictions indicate than an escrow agent may indeed

conspire with one of its principals.[98]

113.      Moreover, the court sees no logical reason why an escrow agent cannot be found

liable for conspiring with one of its principals.  Because the escrow agent has two

competing principals and owes a duty of neutrality to each, the escrow agent lacks an

identity of interest with the principal that would justify the legal fiction of deeming them

a single entity.[99]  Moreover, presumably a principal would not be held liable for its

escrow agent's torts in the same way that an employer, under the doctrine of *respondeat

superior*, is held liable for torts committed by its employee in the scope of his or her

employment.  Finally, there are sound policy reasons for discouraging one principal to an

escrow agreement from upsetting the precarious balance of this three-way arrangement

by conspiring with the escrow agent against the other principal.[100]

114.      The court therefore concludes that Selling Defendants and Title Defendants

constitute two or more persons for the purposes of conspiracy liability.

---

[97] *Cf. Elder*, 1997 WL 528990, at *7 (not designated for publication) (holding that escrow officer could not conspire with escrow agent that employed him).  Although this case demonstrates that Title Defendants cannot conspire together, it does not entail that Title Defendants cannot conspire with Selling Defendants.

Some Texas cases imply in dicta that it is at least conceptually possible for an escrow agent to conspire with its principal.  *See Gonzales v. Am. Title Co. of Houston*, 104 S.W.3d 588, 598-99 (Tex. App. 2003).

[98] *E.g.*, *Helinautica Int'l, S.A. v. Engage Aviation LLC*, No. 8:11–CV–676–T–17TGW, 2011 WL 5553896, at *3 (M.D. Fla. Nov. 15, 2011) (holding that escrow agent has sufficient "personal stake in the activities separate from the principal's interest" such that conspiracy with principal conceptually possible) (citing *Richard Bertram, Inc. v. Sterling Bank & Trust*, 820 So.2d 963 (Fla. Dist. Ct. App. 2002).

[99] *See id.*

[100] *See infra* note 117.  *See also supra* note 52.

### 2. Object to be Accomplished

115.        "In Texas, a civil conspiracy is a combination of two or more persons *joining to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.*"[101]

116.        Civil conspiracy requires the specific intent to act unlawfully.[102]  The mere "joint 'intent to engage in the conduct that resulted in the injury' is not sufficient to establish a cause of action for civil conspiracy."[103]

117.        Defendants shared the unlawful purpose of adversely affecting Plaintiff's rights in the closing process throughout the Second Transaction, thereby leading Title Defendants to breach their fiduciary duties to Plaintiff.

118.        Defendants therefore did not merely intend to enter into an agreement; they intended to unlawfully sell the Property to another purchaser in derogation of Title Defendants' fiduciary duties, as well as to conceal the existence of the Second Transaction and the PSA.

119.         Defendants therefore specifically intended to carry out an unlawful purpose.

### 3. Meeting of the Minds

---

[101] *E.g.*, *Pairett v. Gutierrez*, 969 S.W.2d 512, 516 (Tex. App. 1998) (emphasis added) (citing *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983); *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856 (Tex. 1968)).

[102] *E.g.*, *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 719, 720 n.2 (Tex. 1995); *Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56, 80 (Tex. App. 2004) (citing *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996)).

[103] *Juhl*, 936 S.W.2d at 644 (quoting *Triplex*, 900 S.W.2d at 719).

120.        "One without knowledge of the object and purpose of a conspiracy cannot be a

co-conspirator; he [or she] cannot agree, either expressly or tacitly, to the commission of

a wrong which he [or she] knows not of."[104]  It is therefore "said that one of the essential

elements" of "civil conspiracy is 'a meeting of the minds on the object or course of

action.'"[105]  "[I]n short, there must be a preconceived plan and unity of design and

purpose."[106]

121.        "For a civil conspiracy to arise, the parties must be aware of the harm or wrongful

conduct *at the inception* of the combination or agreement."[107]

122.        Conspiracy requires actual, not constructive, knowledge.[108]

123.        Defendants knew of the existence of the Contract at the time of the Second

Transaction, and therefore knew that Title Defendants owed duties to Plaintiff.

124.        Defendants knew that the Contract had never been formally terminated.

125.        Defendants nonetheless knowingly agreed to the Second Transaction, which

Defendants knew would result in the sale of the subject matter of the Contract to another

party and thereby adversely affect Plaintiff's rights in the closing process.

126.        Defendants further concealed the Second Transaction and the PSA from Plaintiff.

127.        Defendants therefore had knowledge of the wrongful conduct at the inception of

the conspiracy.

---

[104] *Schlumberger*, 435 S.W.2d at 857.

[105] *Id*. (quoting 15A C.J.S. CONSPIRACY § 1(2), p. 599).

[106] *Id*. (quoting 15A C.J.S. CONSPIRACY § 1(2), p. 600).

[107] *Triplex*, 900 S.W.2d at 719 (emphasis added).

[108] *Schlumberger*, 435 S.W.2d at 857.

128.       Defendants therefore engaged in a common plan to engage in an agreement that

breached the duties of loyalty and neutrality Title Defendants owed to Plaintiff.

129.       Again, the provision in the PSA purporting to preserve Plaintiff's rights in the

Contract is insufficient to short-circuit the conspiracy charge.  Defendants still engaged in

conduct that resulted in Title Defendants treating one party to the Contract less favorably

than the other.

130.       Defendants therefore had actual knowledge of, and a meeting of the minds

regarding, the conspiracy alleged.


### 4. Unlawful Overt Acts

131.       Defendants committed one or more unlawful overt acts; namely, Selling

Defendants' delivery and Title Defendants' acceptance of the PSA, as well as Defendants'

handling of the PSA and the Contract.

132.       These acts amounted to a breach of Title Defendants' duty of loyalty.


### 5. Damages as Proximate Result

133.       "[T]he gist of a civil conspiracy is the *damage resulting from commission of a

wrong which injures another*, and *not* the conspiracy itself."[109]

134.       Plaintiff sustained injury, and Title Defendants benefited, from the wrong

committed by Defendants rather than from the mere agreement to conspire.

135.       These damages and benefits were the actual and proximate result of that breach.

---

[109] *E.g.*, *id*. at 856 (emphasis added, citations omitted).

136.      The conspiracy was the cause in fact of Plaintiff's damages.  Had the Second

Transaction not occurred, Plaintiff could eventually have closed the Contract.[110]

137.      Defendants also could have and should have foreseen that their conspiracy would

cause injury to Plaintiff.[111]

138.      The conspiracy therefore actually and proximately caused Plaintiff damages.


*F. Liability*

139.      "Once a civil conspiracy is proved, each conspirator is responsible for all acts

done by any of the conspirators in furtherance of the conspiracy."[112]

140.      "A finding of civil conspiracy further imposes joint and several liability on all

conspirators for actual damages resulting from acts in furtherance of the conspiracy."[113]

---

[110] *See*, *e.g.*, 53 TEX. JUR. 3D NEGLIGENCE § 22.

The court recognizes that this is a close question.  Suppose Selling Defendants engaged in the exact same behavior, but selected a different escrow agent that was unrelated to and unaware of the Contract.  There would then be no breach of fiduciary duty and therefore no conspiracy, but the inconvenience to Plaintiff of hunting down the ultimate buyer of the Property would be the same.

The court nevertheless concludes that the cause in fact element is met because Selling Defendants' conduct was a "substantial factor in bringing about the injury;" that is, it had "such an effect in producing the harm as to lead reasonable persons to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called philosophic sense, which includes every one of the great number of events without which any happening would not have occurred."  *Id.* (citing *City of Sugarland v. Ballard*, 174 S.W.3d 259 (Tex. App. 2005)).  Rather than speculate about the various nasty things that Selling Defendants could hypothetically have done, the court must focus on the nasty thing that Selling Defendants actually did.  Had Selling Defendants not entered the PSA with Title Defendants serving as escrow agent, the Contract would eventually have closed and Plaintiff would have sustained no damages.

*See also infra* note 117.

[111] *See*, *e.g.*, *id*. § 23.

[112] *Helping Hands Home Care, Inc. v. Home Health of Tarrant Cnty.*, 393 S.W.3d 492, 506 (Tex. App. 2013) (citing *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 90 (Tex. App. 2004)).

[113] *Id*. (citing *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex. 1979)).

141.        As stated above, it is not clear the extent to which some of the Defendants

participated in the conspiracy.[114]  At the damages phase, Plaintiff is instructed to

demonstrate to the court the extent to which each Defendant was responsible for the

conspiracy.  Those Defendants found to have acted in furtherance of Title Defendants'

breach of fiduciary duty will be deemed jointly and severally liable for all unlawful acts

taken by all Defendants in the conspiracy.


## III. CONCLUSION

Selling Defendants engaged in conduct that was less than admirable, but as a matter of

law they did not commit negligence.  Selling Defendants tried to have their proverbial cake and

eat it too by having two potential buyers waiting in the wings in case one defaulted on its

obligations.  Selling Defendants also maintained total silence in the face of Plaintiff's desperate

requests for information.

But not all undesirable behavior is negligent or illegal.  At bottom, Plaintiff, by

repleading its unsuccessful contract claim as a tort claim, is attempting to get around the fact that

it voluntarily relinquished its right to breach of contract damages.  Texas law does not allow such

artful pleading to succeed.[115]

However, Title Defendants are held to a higher duty than Selling Defendants, albeit one

less stringent than more traditional agency relationships.  As escrow agents, Title Defendants had

a responsibility to treat both Plaintiff and Selling Defendants neutrally.  Title Defendants' act of

self-dealing upset the precarious balance set by an escrow relationship by impermissibly favoring

---

[114] *See supra* note 9.

[115] *See, e.g., Airborne Freight Corp., Inc. v. C.R. Lee Enters.*, 847 S.W.2d 289, 291 (Tex. App. 1992) ("This case involves a contract dispute, and there's the rub.").

one party over another. For this, Title Defendants are liable for breach of fiduciary duty and negligence.

Though Selling Defendants may escape negligence liability, they played such a significant role in Title Defendants' breach of fiduciary duty that they too must be held liable for the breach.[116] Selling Defendants enticed Title Defendants to favor Selling Defendants' interests over those of Plaintiff.[117]

Defendants may have had good reason to enter the Second Transaction; the record suggests that Plaintiff acted lackadaisically in its attempts to comply with the terms of the Contract. As a result, Defendants may very well be able to prove that Plaintiff is entitled to minimal (or even nominal) damages when the court moves to the damages phase of the Adversary. Again, the court reaches no decision on that matter at this time.[118] But Defendants did not react properly or prudently in response to Plaintiff's failures, and they are therefore liable

---

[116] However, to reiterate, Selling Defendants cannot be held liable for conspiracy to commit negligence. *E.g.*, *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996).

[117] The court is aware that this result may appear anomalous at first glance; had Selling Defendants engaged in the exact same behavior, but used a different escrow agent that was unaware of the Contract, Selling Defendants would likely escape liability under any of the grounds pleaded by Plaintiff. This would be true even though Plaintiff would be put through the same inconvenience, and Selling Defendants would have reaped similar benefits, under either scenario. *See supra* note 110.

Much of this anomaly results only because of the peculiar facts of the Adversary. Selling Defendants would likely be liable for breach of contract no matter which escrow agent it employed had Plaintiff not waived its right to damages in the Contract. Thus, the possibility that Selling Defendants could escape liability entirely in the Adversary stems not from incoherence in the applicable law but rather because of Plaintiff's own exercise of its freedom of contract.

Moreover, the result is not anomalous at all when one considers the importance the law places upon fiduciary relationships. Fiduciaries, be they escrow agents or otherwise, are held to stringent standards because of their importance in everyday economic affairs. *See supra* note 52. This is true even for escrow agents, who owe their principals less exacting duties than employees owe their employers or attorneys owe their clients. Knowing and intentional interference with one of these relationships, such as that which Selling Defendants committed here, should not be taken lightly, even where similar damage could have occurred if only the facts were slightly different. *See supra* note 100 and accompanying text. Selling Defendants, having upset the tenuous equilibrium of power characteristic of an escrow relationship for their own financial benefit, must be held accountable.

[118] Nor does the court decide at this juncture whether Plaintiff is entitled to the attorney's fees and exemplary damages it requests. *See* Petition at 10-11.

for their respective torts.  The Adversary that has raged for three years must proceed to its final stage.

These findings and conclusions shall be subsumed by final judgment.  The parties are directed to obtain a setting to try the issue of damages.